UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                          :
           In re:                         :        Chapter 11
                                          :
COMPLETE MANAGEMENT, INC.,                :        Case No. 99 B 10857 (RLB)
                                          :
           Debtor.                        :
                                          :
------------------------------------------------------x

<u>**DEBTOR'S CHAPTER 11 THIRD AMENDED PLAN OF REORGANIZATION**</u>

Complete Management, Inc., debtor and debtor in possession in the above-captioned chapter

11 case, hereby proposes the following third amended Chapter 11 Plan (the "Plan") pursuant to section

1121 of the Bankruptcy Code, and agrees to be bound thereby:

<u>**ARTICLE 1**</u>: <u>**Definitions and Rules of Interpretation**</u>

A.     <u>**Definitions**</u>

The following terms, when used in this Plan or any subsequent amendments or modifications

thereof, and in addition to those terms defined in the text of the Plan, shall have the respective meanings

hereinafter set forth.

1.1     "Administrative Bar Date" means the first business day which is the ninetieth (90th) day

after the Effective Date or such other date established by order of the Bankruptcy Court as the last date

to file requests for payment of Administrative Expense Claims, including Claims for Professional Fees.

1.2     "Administrative Expense Claim" means any right to payment constituting a cost or

expense of administration of the Chapter 11 Case Allowed under sections 503(b) and 507(a)(1)

including (a) any actual and necessary costs and expenses of preserving the estate of the Debtor, (b)

60609

any necessary costs and expenses of operating the Debtor's business, (c) any indebtedness or obligations incurred or assumed by the Debtor in the ordinary course of business in connection with the conduct of its business, (d) reclamation claims Allowed in accordance with section 546(c)(2) of the Bankruptcy Code, (e) allowances of compensation and reimbursement of expenses to the extent Allowed by Final Order under sections 330, 331 or 503 of the Bankruptcy Code, whether fixed before or after the Effective Date, and (1) any fees or charges assessed against the Debtor's estate under section 1930, Chapter 123, title 28, United States Code, including post-Confirmation Date and post-Effective Date fees and charges.

1.3     "Administrative Period" means the period beginning on the Filing Date and ending on the Effective Date.

1.4     "Allowed" means, with reference to any Claim (including any Administrative Expense Claim), (a) any Claim against the Debtor, proof of which was filed within the applicable period of limitation fixed by the Bankruptcy Court in accordance with Rule 3003(c)(3) of the Bankruptcy Rules (i) as to which, no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, (ii) as to which no action has been commenced to avoid such Claim within the applicable period of limitation fixed by this Plan, (iii) as to which an objection has been interposed, to the extent such Claim has been allowed (whether in whole or in part) by a Final Order, (b) if no proof of Claim was so filed, any Claim against the Debtor which has been listed by the Debtor in the Schedules, as such Schedules may be amended from time to time in accordance with Rule 1009 of the Bankruptcy Rules, as liquidated in amount and not disputed or contingent (or which proof of Claim has been withdrawn or Disallowed),

(c) any Claim arising from the recovery of property under sections 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(b) of the Bankruptcy Code, (d) any Claim allowed under or pursuant to the terms of this Plan, or (f) any Claim that has been allowed by a Final Order.

1.5    "Amended CMI Group" means the plaintiffs in the Class Action, which plaintiffs have alternatively gone by the designation of "the Lead Plaintiffs."

1.6    "Assigned Causes of Action" means all Causes of Action accruing prior to the Effective Date that belong to the Debtor, a debtor-in-possession, the Debtor's estate, a chapter 11 trustee, or the Creditors' Committee. "Assigned Causes of Action" shall not include the Class Action Causes of Action, as hereafter defined.

1.7    "August Allocation" means the amount of New Common Stock obtained by dividing the total amount of the Allowed August Debenture Claims by the Class 3N Claim Amount, and multiplying the result by the number of shares of New Common Stock issued to Class 3.

1.8    "August Debenture" means a convertible subordinated debenture issued pursuant to the August Indenture.

1.9    "August Debenture Claim" means a Claim based on an August Debenture.

1.10    "August Indenture" means the indenture pursuant to which the Debtor issued 8% convertible subordinated debentures due August 15, 2003.

1.11    "August Indenture Trustee" means The Chase Manhattan Bank, N.A. or such other trustee as is selected under the terms of the August Indenture.

1.12    "Bankruptcy Code" means title 11 of the United States Code, as amended, in effect and applicable to the chapter 11 case concerning the Debtor.

1.13    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Reorganization Case.

1.14    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States, as amended, in effect and applicable to the Debtor's Reorganization Case.

1.15    "Business Day" means any day of the week which does not fall on a Saturday, Sunday or "legal holiday" as defined at Bankruptcy Rule 9006(a).

1.16    "Cash" means legal tender of the United States, including amounts on deposit at financial institutions in checking accounts, money market accounts and the like.

1.17    "Causes of Action" means any and all actions, causes of action, Claims, liens, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law, equity or otherwise, including, as applicable, Causes of Action of the Debtor's estate, including, but not limited to, those causes of action arising under sections 502, 510, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or those Causes of Action belonging to a subsidiary of the Debtor, and causes of action belonging to the Creditors' Committee, including, but not limited to, the Creditors' Committee's D&O Actions.  "Causes of Action" shall not include the Class Action Causes of Action, as hereafter defined.

1.18    "Chapter 11 Case" means the case the Debtor commenced under chapter 11 of the Bankruptcy Code, docket no. 99-10857 (RLB).

1.19    "Chief Executive Officer" means Steven Rabinovici, the Debtor's current chief executive officer.

1.20    "Claim" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; and also includes rights to payment evidenced by Treasury August Debentures and Treasury December Debentures.

1.21    "Claimant" means the holder of a Claim against the Debtor.

1.22    "Class" means a category of holders of Claims or interests which are substantially similar to other Claims or interests in such Class.

1.23    "Class Action" means the purported class action lawsuit commenced in the United States District Court for the Southern District of New York by the Amended CMI Group, entitled In re Complete Management Inc. Securities Litigation, docket no. 99 Civ. 1454 (NRB).

1.24    "Class Action Causes of Action" shall mean the causes of action alleged in, or otherwise subject to or potentially included as a proper cause of action in the Class Action, regardless of whether such cause of action was actually asserted in the Class Action.

1.25    "Class 3 Claim Amount" means the aggregate amount of net proceeds of the Litigation Trust to which holders of Allowed Class 3 Claims are entitled, which is the aggregate face amount of the Allowed Class 3 Claims, plus Class 3 Interest, reduced by the New Common Stock Value. Allowed Claims for Treasury August Debentures and Treasury December Debentures shall be treated as Allowed Class 3 Claims for purposes of computing the Class 3 Claim Amount.

1.26    "Class 3 Interest" means the interest that accrues on the Class 3 Claim Amount, commencing on the Effective Date, at the interest rate and on terms as determined by the Bankruptcy Court at the Confirmation Hearing and set forth in the Confirmation Order.

1.27    "Class 4 Claim Amount" means the aggregate face amount of the Allowed Class 4 Claims that are subordinated pursuant to section 510(b) of the Bankruptcy Code, plus interest commencing on the Effective Date, on the same terms and rates as the Class 3 Interest.

1.28    "Collection Agreement" means that agreement (dated June 9, 2000, and amended on April 6, 2001, which amendment was approved by order of the Bankruptcy Court dated April 18, 2001) by and among the following: the Debtor, Complete Management, Inc.; the Official Committee of Unsecured Creditors; DVI Business Credit Corporation; HealthShield Capital Corporation; Medical Management, Inc.; Medical Receivables Corporation; Lawrence Shields, M.D.; Greater Metropolitan Neurology Services, P.C.; Complete Medical Services, P.C.; and Objective Medical Evaluation.

1.29    "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Docket of the Bankruptcy Court.

1.30    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of this Plan, as it may be adjourned or continued from time to time.

1.31    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.32    "CMI" means Complete Management, Inc.

1.33    "Convenience Claims" means General Unsecured Claims of the Debtor of $100 or less, or that the Claimant elects to reduce to $100.

1.34 "Creditor" means any person that either (i) holds a claim which arose before the Petition Date, (ii) holds a claim which arose after the Filing Date, other than an Administrative Expense Claim of the type specified in Bankruptcy Code section 503(b), or (iii) holds a claim of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i).

1.35 "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the United States Trustee.

1.36 "D&O Actions" means any and all Causes of Action belonging to a Person against the Debtor's past or present officers and/or directors. "D&O Actions" shall not include the Class Action Causes of Action, as previously defined.

1.37 "Debtor" means CMI.

1.38 "December Allocation" means the amount of New Common Stock obtained by dividing the total amount of the Allowed December Debenture Claims by the Class 3 Claim Amount, and multiplying the result by the number of shares of New Common Stock issued to Class 3.

1.39 "December Debenture" means a convertible subordinated debenture issued pursuant to the December Indenture.

1.40 "December Debenture Claim" means a Claim based on a December Debenture.

1.41 "December Indenture" means the indenture pursuant to which the Debtor issued 8% convertible subordinated debentures due December 15, 2003.

1.42 "December Indenture Trustee" means The Chase Manhattan Bank, N.A. or such other trustee as is selected under the terms of the December Indenture.

1.43    "Designated Receivables" shall mean those accounts receivable (originally generated by healthcare providers with which the Debtor had management agreements), which receivables the Debtor's subsidiary, HealthShield, is presently collecting pursuant to the Collection Agreement.

1.44    "Disclosure Statement" means the document, and all exhibits, annexed thereto, together with any letter from the Creditors' Committee, or from any member or members of the Creditors' Committee, which letter seeks to solicit the votes of creditors in connection with the Debtor's Plan, filed in connection with Debtor's Chapter 11 Case pursuant to section 1125 of the Bankruptcy Code, and approved by the Bankruptcy Court as containing "adequate information" as that term is defined in section 1125(a)(1) of the Bankruptcy Code, as may be amended or modified from time to time by any duly authorized amendment or modification.

1.45    "Disputed Claim" means a Claim with respect to which an objection has been duly filed and not subsequently withdrawn, and which has not been finally determined by an order of the Bankruptcy Court.

1.46    "Effective Date" means the first Business Day after (a) the Confirmation Order has been entered pursuant to Bankruptcy Rules 5003 and 9021, and shall not have been stayed, suspended, modified, vacated or reversed; and (b) all conditions precedent in Section 7.1 hereof have been satisfied or waived as provided in section 7.3 hereof.

1.47    "FAI" means FAI General Insurance Company Limited.

1.48    "Final Order" means an order or judgment of the Bankruptcy Court, as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending,

provided, however, if an appeal, or writ of certiorari, reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, further, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.49    "General Unsecured Claim" means any Claim against the Debtor that is not a Secured Claim, Administrative Expense Claim, Priority Tax Claim or Priority Non-Tax Claim.

1.50    "HealthShield" means HealthShield Capital Corporation, a partially-owned subsidiary of the Debtor.

1.51    "HealthShield Loan and Security Agreement" means that certain Loan and Security Agreement dated May 14, 2001 (between HealthShield Capital Corporation as Borrower and DVI Business Credit Corporation as Lender), and any subsequent amendments or modifications thereto.

1.52    "HealthShield Plan Obligations" means those obligations of HealthShield under the Plan, including, but not limited to, (i) the Professional Fee Agreement (annexed to the Plan as Exhibit D), (ii) the Debtor's Contracts with HealthShield, and with Shields and Hirschfeld, as Amended by Negotiations with Creditors' Committee (annexed to the Plan as Exhibit F), and (iii) the Tax Sharing Agreement (annexed to the Plan as Exhibit E).

1.53    "IPG" means Intertech Penta Group, Inc., a wholly-owned subsidiary of the Debtor.

1.54    "Indemnification Claims" means Claims for indemnification against the Debtor held by current or former officers and directors of the Debtor.

1.55    "Lead Plaintiffs" means those plaintiffs designated as lead plaintiffs in the Class Action, which plaintiffs have also been known as "Amended CMI Group."

1.56    "Liabilities" means any and all costs, expenses, actions, causes of action, suits, controversies, damages, claims, liabilities or demands of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity, or under any statute, based in whole or in part upon any act or omission or other occurrence taking place on or prior to the Effective Date; provided, however, that Liabilities shall not include any liabilities to Professional Persons for unpaid professional fees and reimbursement of expenses accrued from and after the Petition Date.

1.57    "Litigation Trust" means the trust established pursuant to section 6.8(a) hereof.

1.58    "Litigation Trustee" means a trustee appointed pursuant to the Litigation Trust Agreement.

1.59    "Litigation Trust Agreement" means the agreement among the Debtor, the Creditors' Committee, and the Litigation Trustee in connection with the Litigation Trust, which Agreement is substantially in the form annexed to this Plan as Exhibit A.

1.60    "Mde.com" means Mde.com, Inc., a subsidiary of HealthShield, which owns eighty-three percent (83%) of Mde.com.

1.61    "MMI" means Medical Management, Inc., a wholly-owned subsidiary of the Debtor.

1.62    "MRC" means Medical Receivables Corp., a wholly-owned subsidiary of the Debtor.

1.63     "New Board" means new board of directors of the Reorganized Debtor pursuant to Section 9.2 of the Plan.

1.64     "New Common Stock" means the class or series of common stock to be issued by the Debtor pursuant to this Plan.

1.65     "New Common Stock Value" means the fair market value of the New Common Stock, as determined by the Debtor in advance of the Confirmation Hearing.

1.66     "Old Common Stock" means the class or series of common stock issued by the Debtor prior to the Filing Date, including (a) redemption, conversion, exchange, voting, participation and dividend rights, (b) liquidation preferences, and (c) stock options and warrants.

1.67     "Person" means an individual, corporation, partnership, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

1.68     "Petition Date" means October 12, 1999, the date upon which CMI filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code.

1.69     "Plan" means this Third Amended Plan of Reorganization, and any exhibits annexed hereto and any documents delivered in connection herewith, as the same may be amended or modified from time to time by any duly authorized amendment or modification.

1.70     "Pre-Petition Causes of Action" means any and all Causes of Action that arose on or before the Petition Date and also is an Assigned Cause of Action.

1.71   "Priority Claim" means a Claim which qualifies for priority treatment under section 507(a) of the Bankruptcy Code, excluding Claims entitled to priority under Bankruptcy Code subsections 507(a)(1) and 507(a)(8).

1.72   "Priority Tax Claim" means a Claim of any governmental unit, for a tax incurred prior to the Filing Date, purporting to satisfy the requirements of section 507(a)(8) of the Bankruptcy Code entitling such Claim to priority treatment.

1.73   "Professional Fee Agreement" means that agreement (annexed to the Plan as Exhibit D), by and among the Debtor, the Creditors' Committee, HealthShield, and the Professional Persons retained by the Debtor or the Creditors' Committee in the Chapter 11 Case.

1.74   "Professional Person" means any person retained by the Debtor or by the Creditors' Committee during the Chapter 11 Case or to be compensated by the Estate pursuant to sections 327, 328, 330 and/or 503(b) of the Bankruptcy Code.

1.75   "Pro Rata" means proportionally, so that the ratio of the amount of consideration distributed on account of a Claim to the amount of the Claim is the same as the ratio of the amount of consideration distributed on account of all Claims of the Class in which the particular Claim is included to the amount of all Claims of that class.

1.76   "Purported Class Proof of Claim" means that certain proof of claim, number 165, in the amount of at least $212,000,000.00, filed on June 19, 2000 by Amended CMI Group  against the Debtor in the Chapter 11 Case, or any subsequent amendment to claim number 165.

1.77   "Reorganized Debtor" means CMI as of and after the Effective Date.

1.78    "Replacement Lender" means any lender to HealthShield that either purchases from, or takes an assignment from, DVI Business Credit Corporation ("DVIBC") of DVIBC's loans (including revolving loans), advances and other credits extended to HealthShield, pursuant to the HealthShield Loan and Security Agreement and any subsequent amendments or modifications thereto.

1.79    "Retirement Plan" means any and all 401(k) savings and investment plans the Debtor has maintained, including all plan documents, trusts, and related agreements thereto.

1.80    "Schedules" means the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, statements of financial affairs and other schedules and statements filed by the Debtor pursuant to Federal Rule of Bankruptcy Procedure 1007, and any amendments thereto.

1.81    "SEC Compliance Date" means the date on which the Debtor (or the Reorganized Debtor, as the case may be) has made all filings required by the Securities and Exchange Commission, or the date on which the Securities and Exchange Commission has waived any filing required of the Debtor or the Reorganized Debtor; provided, however, that nothing in this Plan shall be deemed to prevent the Securities and Exchange Commission from excusing or waiving any filing that would otherwise be required of the Debtor or the Reorganized Debtor.    1.82    "Secured Claim" means a Claim secured by a "lien," as that term is defined in section 101(37) of the Bankruptcy Code, including, but not limited to, a "judicial lien" as that term is defined at section 101(36) of the Bankruptcy Code, against any property of the Estate, but only to the extent of the "value," as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012 or as otherwise agreed to, of such Claimant's interest in the Debtor's interest in such property.

1.83    "Secured Creditor" means the holder of a Secured Claim.

1.84    "Secured Notes" means (a) the 9% promissory notes due in July 15, 2000 (the "9% Notes") issued by the Debtor and (b) the 8% senior secured notes due in 2001 issued by the Debtor (the "8% Notes") which are secured by the shares of stock owned by the Debtor in HealthShield, IPG, and MMI.

1.85    "Secured Note Claims" means any and all Claims arising from the Secured Notes.

1.86    "Security Claims" means any and all Claims against any Person (a) arising from rescission of a purchase or sale of a security of the Debtor or (b) for damages arising from the purchase or sale of a security of the Debtor.

1.87    "Soundview" means Soundview Capital Corporation, a subsidiary of HealthShield Capital Corporation, which owns eighty percent (80%) of Soundview.

1.88    "Tax Sharing Agreement" means that agreement between the Debtor and HealthShield Capital Corporation, annexed to this Plan as Exhibit E.

1.89    "Treasury August Debenture" means an August Debenture owned by the Debtor.

1.90    "Treasury December Debenture" means a December Debenture owned by the Debtor.

1.91    "United States Trustee" means any and all representatives and employees of the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, the entity empowered to administer the Chapter 11 Case on behalf of the United States Department of Justice.

1.92    "Unsecured Claim" means any Claim which does not satisfy the requirements of an Administrative Expense Claim, Secured Claim, Priority, Tax Claim, Priority Non-Tax Claim or Penalty Claim and which is not an interest of a holder of Old Common Stock.

1.93    "William Harris Investors" means each of Irving B. Harris Revocable Trust, Roxanne H. Frank Revocable Trust, Harris Foundation, Couderay Partners, Irving B. Harris Grandchildren Charity Trust, Fred Holubow, Irving Harris Foundation, Irving Harris Foundation A, Irving Harris Foundation B, Suzanne Kahn Revocable Trust, William Harris & Co. Profit Sharing Trust, William Harris Investors Growth Fund, Suzanne F. Kahn Revocable Trust, HFF Partners and Astro Communications, and the partners, members, beneficiaries, trustees, officers, directors, successors and assigns of each of the foregoing.

## B.    Rules of Interpretation

For purposes of this Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any references in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in the Plan, any reference in the Plan to an existing document or appendix filed or to be filed means such document or appendix, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) unless otherwise specified herein, any reference to an entity as a holder of a Claim or interest includes that entity's successors, assigns and affiliates; (e) unless otherwise specified, all references in the Plan to sections, articles and schedules are references to sections, articles and schedules of or to the Plan; (f) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply.

**ARTICLE 2: Payment of Claims Not Required To Be Classified**

2.1     Administrative Expense Claims, Priority Tax Claims and Other Claims Not Classified.

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority

Tax Claims are not classified by a plan.

2.2.    Payment of Allowed Administrative Claims (other than Professional Fees and

Expenses).  Except as otherwise provided in the Plan, or by the consent of such Person, each Person

holding an Allowed Administrative Expense Claim as of the Confirmation Date shall be paid in full in

Cash on the Effective Date or pursuant to the ordinary terms of payment applicable to such Claim.  If

the August and December Indenture Trustees provide counsel for the Debtor and the Creditors'

Committee with documentation to support the fees and expenses incurred by such Trustees during the

Administrative Period, and if the Debtor and the Creditors' Committee determine that such fees and

expenses are reasonable under the circumstances of this Chapter 11 Case, such fees and expenses will

be paid on the Effective Date without the necessity for  approval by the Bankruptcy Court.

Administrative Expense Claims not Allowed as of the Confirmation Date shall be paid in the same

manner as "Professional Fees and Expenses" in section 2.3 hereof, and in the Professional Fee

Agreement annexed hereto as Exhibit D.

2.3     Payment of Professional Fees and Expenses.  Compensation and reimbursement of fees

and expenses awarded to Professional Persons pursuant to section 330 of the Bankruptcy Code

(collectively, "Professional Fees and Expenses") shall be paid, after an order of the Bankruptcy Court -

- that has been entered pursuant to Bankruptcy Rules 5003 and 9021, and has not been stayed,

suspended, vacated, modified or reversed -- has awarded such compensation and reimbursement of

expenses as Allowed Administrative Expense Claims, by Reorganized CMI and/or the Litigation Trust, as set forth herein.

Each Professional Person retained by the Debtor or the Creditors' Committee agrees to be bound by, and not opt out of, either (1) the Professional Fee Agreement, or (2) alternative arrangements such as the Reorganized Debtor and the affected Professional Person may make for the payment of the affected Professional Person's Allowed Claim for Professional Fees and Expenses, in such a manner as to satisfy section 1129(a)(9) of the Bankruptcy Code. A Professional Person's agreement to accept payment of the amount of its Allowed Claim for Professional Fees and Expenses from the assets of the Litigation Trust is not, and shall not be deemed or construed as, a waiver of the obligation of Reorganized CMI under this Plan to pay, in full, all Allowed Claims for Professional Fees and Expenses. The Professional Fee Agreement, by and among the Debtor, the Creditors' Committee, HealthShield and the Professional Persons retained by the Debtor and Creditors' Committee, is annexed as Exhibit D to this Plan.

2.4    Payment of Allowed Priority Tax Claims.  Priority Tax Claims, Allowed as of the Confirmation Date, shall be paid at the Reorganized Debtor's election either in full in Cash on the Effective Date or six years from the earlier of the date of assessment or the Effective Date, with accrued interest at the statutory rate applicable to such Claim or, if no such rate exists, at 6%.

2.5    Procedures for Administrative Claims Not Allowed as of the Effective Date.  The Confirmation Order shall specifically provide that each Administrative Expense Claimant, including Claimants seeking allowance of Professional Fees and Expenses, that fails to timely and duly file a request for payment of its Administrative Claim by the Administrative Bar Date shall have its Claim

expunged and shall thereafter be forever barred from asserting any such Administrative Claim.

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account

of Administrative Claims and Priority Tax Claims until such Claim becomes an Allowed Claim pursuant

to Final Order, or unless an order of the Bankruptcy Court provides otherwise.

### ARTICLE 3: Designation of Classes of Claims and Interests

3.1     Secured Claims.  Class 1 shall consist of all Secured Note Claims against the Debtor.

3.2     Priority Non-Tax Claims Required to be Classified.  Class 2 shall consist of all

Unsecured Claims against the Debtor entitled to priority pursuant to section 507(a)(3), (a)(4), (a)(5),

(a)(6), (a)(7), and (a)(9) of the Bankruptcy Code.

3.3     General Unsecured Claims.  Class 3 shall consist of all General Unsecured Claims

against the Debtor, except for those claims subordinated pursuant to section 510(b) of the Bankruptcy

Code (and which claims are treated in Class 4), but excluding those Claims classified in Classes 5, 7

and 8.  (The claims of claimants who currently hold either August Debentures, December Debentures,

or both August and December Debentures, and whose claims against the Debtor have been asserted

by the Amended CMI Group -- i.e., the "Lead Plaintiffs" in the Class Action -- shall be treated in Class

3.  To the extent that the Class 3 claims of members of the Amended CMI Group are based on current

ownership of either August Debentures or December Debentures, such claims shall receive treatment in

Class 3 only to the extent of the particular Debentures' face value, i.e., principal and interest that

accrued prior to the Petition Date.)

3.4     Subordinated Claims.     Class 4 shall consist of those claims subordinated pursuant to

section 510(b) of the Bankruptcy Code, for which claims the security of the Debtor at issue is either an

August Debenture, a December Debenture, or some other debt security issued by the Debtor. (The claims of claimants who previously held either August Debentures, December Debentures, or both, but do not presently hold such Debentures, and whose claims against the Debtor have been asserted by Amended CMI Group -- i.e., the "Lead Plaintiffs" in the Class Action -- shall be treated in Class 4. To the extent that the Class 4 claims of members of Amended CMI Group are based on former ownership of either August Debentures or December Debentures, such claims shall receive treatment in Class 4 only to the extent of the particular Debentures' face value, i.e., principal and interest that accrued prior to the Petition Date.)

3.5     Indemnification Claims. Class 5 shall consist of Indemnification Claims against the Debtor.

3.6     Other Secured Claims. Class 6 shall consist of all Secured Claims against the Debtor not classified in Class 1.

3.7     Convenience Claims. Class 7 shall consist of all Convenience Claims.

3.8     Equity. Class 8 shall consist of (i) all holders of Old Common Stock of the Debtor, as well as (ii) all holders of those Claims subordinated pursuant to section 510(b) of the Bankruptcy Code, for which Claims the security of the Debtor at issue is Old Common Stock.

### ARTICLE 4: Treatment of Unimpaired Classes

4.1     Unimpaired Classes. Class 2 is not impaired under the Plan, and thus such holders are not permitted to vote to accept or reject the Plan, since such holders are deemed to have voted in favor of the Plan pursuant to section 1126(f) of the Bankruptcy Code.

4.2    Treatment of Class 2.  The Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of Claims in Class 2 are entitled.

## ARTICLE 5: Treatment of Impaired Classes

5.1    Impaired Classes.  Class 1, Class 3, Class 4, Class 5, Class 6 ,Class 7 and Class 8 are impaired under the Plan.

5.2    Treatment of Class 1.  Under the Plan, in complete satisfaction of the allowed Class 1 Claims, the Class 1 Claimants will receive the following treatment:

**5.2.1.  CMI Secured Notes**:  Class 1 Claimants will receive their Pro Rata share of secured notes (the "CMI Secured Notes") to be issued on the Effective Date by the Reorganized Debtor in the aggregate principal (face) amount of $3,068,189, substantially in the form annexed hereto as Exhibit B. This distribution shall be as follows:  William Harris Investors shall receive CMI Secured Notes in the aggregate principal (face) amount of $2,500,000.00; FAI (to the extent that it holds an allowed secured claim in Class 1) shall receive a CMI Secured Note in the principal (face) amount of $568,189.00. The CMI Secured Notes shall bear annual interest at the rate of seven percent (7%), and have a four-year maturity.

The CMI Secured Notes will be secured by a pledge of all of the stock of HealthShield owned by the Reorganized Debtor as of the Effective Date, pursuant to a Stock Pledge Agreement substantially in the form of Exhibit C annexed hereto (the "Stock Pledge Agreement").  The holders of CMI Secured Notes shall be bound by the terms of the Stock Pledge Agreement, the terms of which are hereby incorporated herein by reference, whether or not such holders of CMI Secured Notes execute such Stock Pledge Agreement.  As soon after the Effective Date as practicable, the Reorganized Debtor shall deliver to William Harris Investors, as agent for the Class 1 Claimants under the Stock Pledge Agreement, all of the stock of HealthShield owned by the Reorganized Debtor as of the Effective Date.

Interest on the CMI Secured Notes will be paid semi-annually in cash; alternatively, during the first two years of the term of such CMI Secured Notes -- and if, in the reasonable, good-faith determination of the Class 1 Claimants, the Reorganized Debtor does not have cash on hand, or available through commercially reasonable borrowing, sufficient to pay the semi-annual interest on the CMI Secured Notes -- such interest (i) may be either added to the existing unpaid principal on such Notes, or (ii) may be paid through the Reorganized Debtor's issuance of additional CMI Secured Notes to the holders of such Notes.  The CMI Secured Notes, together with all outstanding and

accrued interest, may be prepaid, at the option of the Reorganized Debtor, in whole or in part, without penalty.

The holders of the CMI Secured Notes shall also have the benefit of the covenants or undertakings of HealthShield, as contained in paragraphs 7, 9, 10 and 12 of the Professional Fee Agreement (annexed to the Plan as Exhibit D) as if each holder of the CMI Secured Notes were named as a "Professional" pursuant to such Professional Fee Agreement.

The Reorganized Debtor shall also enter into a tax sharing agreement with its majority-owned subsidiary, HealthShield, which agreement -- in substantially the same form as that annexed to this Plan as Exhibit E (the "Tax Sharing Agreement"), which, by this reference, is incorporated herein -- will provide that, in consideration of the benefits HealthShield shall receive from tax consolidation with the Reorganized Debtor, HealthShield shall pay to the Reorganized Debtor its "Excess Cash" (as defined in section 1(i) of the Tax Sharing Agreement) in the form of HealthShield's estimated tax payments to the Reorganized Debtor on account of federal, state and local taxes (as provided in section 3(a), (b) and (c) of the Tax Sharing Agreement).

**5.2.2. Litigation Trust Notes:** Class 1 Claimants will receive their Pro Rata share of unsecured notes in the aggregate principal (face) amount of $490,909.00 issued by the Litigation Trust (the "Litigation Trust Notes"). This distribution shall be as follows: William Harris Investors shall receive a Litigation Trust Note in the principal (face) amount of $400,000 and FAI shall receive a Litigation Trust Note in the principal (face) amount of $90,909.00. As set forth in the Litigation Trust Agreement, after payment in full of the expenses of the Litigation Trust and of Allowed Professional Fees and Expenses of this Chapter 11 Case, the Litigation Trust Notes shall be redeemable as follows: (i) 50% of gross collections by the Litigation Trust from Causes of Action against officers and directors (including any recovery from D&O insurance policies) and (ii) 25% of the collections by the Litigation Trust from all other Causes of Action including Causes of Action against the Debtor's pre-Petition financial professionals, including, but not limited to, Arthur Andersen LLP.

Class 1 Claimants will cooperate with and assist the Litigation Trustee in pursuing such claims from which the Litigation Trust Notes are redeemable and will provide the time and access to documents in the possession of William Harris Investors or FAI as may be necessary to fulfill such undertaking. The lesser of the first $100,000.00 or all amounts received by William Harris Investors as a result of any redemption of the Litigation Trust Notes from William Harris Investors's participation in 25% of the collections by the Litigation Trust from all other Causes of Action (including Causes of Action against the Debtor's pre-Petition financial professionals, including, but not limited to, Arthur Andersen LLP) shall be placed by the Litigation Trustee in an interest-bearing escrow account for a period not to exceed nine (9) months. During such nine-month period, if there is a dispute between William Harris Investors and the Litigation Trustee regarding the cooperation and assistance of William Harris Investors to the Litigation Trustee, the Litigation Trustee shall have the right to petition the Bankruptcy Court for a forfeiture of the escrow amount or an extension of time from which the escrow

amount may be distributed to William Harris Investors. Any determination of the Bankruptcy Court on the issue of William Harris Investors's cooperation and assistance shall be final. Any forfeiture of the escrow amount shall be for the non-William Harris Investors beneficiaries of the Litigation Trust. (A copy of a model Litigation Trust Note is annexed as Exhibit C to the Litigation Trust Agreement, which itself is Exhibit A to this Plan.)

**5.2.3. Equity in Reorganized Debtor**: Class 1 Claimants shall receive a total of 9.2% of the fully-diluted stock of the Reorganized Debtor, before any allocation to management and board members of New Common Stock and option incentives capped at ten percent. This 9.2% distribution shall be as follows: William Harris Investors shall receive New Common Stock based on (i) an equal percentage of William Harris Investors' present equity stake in HealthShield, to be exchanged for New Common Stock (amounting to approximately 3.0% of the New Common Stock), together with (ii) a pro rata distribution to William Harris Investors of 6.2% of all New Common Stock, amounting to about 5.1% of all New Common Stock. FAI shall receive a pro rata distribution of the above 6.2% of all New Common Stock, amounting to approximately 1.1% of all New Common Stock.

**5.2.4. Allowed Unsecured Claim:** Class 1 Claimants shall receive, Pro Rata, an Allowed Unsecured Claim equal to the amount determined as follows: the Class 1 Claimants' Claims as of the Petition Date (as per the respective proofs of claim filed by each Class 1 Claimant in the Chapter 11 Case), <u>plus</u> the amount of Class 1 Claimants' combined legal fees in the Chapter 11 Case, up to an aggregate maximum of $153,409.25, <u>less</u> the sum of (a) the principal amount of the CMI Secured Notes (i.e., $3,068,189.00), (b) the aggregate principal amount of the Litigation Trust Notes (i.e., $490,909.00), and (c) the value of the New Equity Interest, determined based upon the net percentage of HealthShield's book value, which shall be determined in advance of the Confirmation Hearing. Class 1 Claimants' Allowed Unsecured Claim will rank <u>pari passu</u> with, and shall be treated consistently with, all other Allowed Unsecured Claims in Class 3.

**5.2.5. Total Return/Overall Cap:** The total recovery to Class 1 Claimants under the Plan ("Class 1 Total Return") shall be subject to a ceiling ("Overall Cap"). The Class 1 Total Return shall equal the sum of (i) the CMI Secured Notes, excluding any interest thereon, (ii) the sums received pursuant to the Litigation Trust Notes, (iii) the market value of the New Equity Interest, calculated on the basis of the average closing price for the 30 business days preceding the fourth anniversary of the Effective Date, and (iv) the value of all recoveries from Class 1 Claimants' Allowed Unsecured Claim (with the New Equity Interest determined as per clause (iii) above).

The Overall Cap shall be: Class 1 Claimants' secured claim for principal as of the Petition Date (excluding any claim for post-petition interest and expenses), accreting at 6.0% per year, beginning on the Effective Date. The Total Return above the Overall Cap shall be subject to a clawback, the amount of which, if any, shall be calculated on the fourth anniversary of the Effective Date, so as to coincide with the CMI Secured Notes' maturation. The clawback, if any, shall be made by Class 1 Claimants

surrendering, at their option, either the appropriate amount of CMI Secured Notes or stock in the Reorganized Debtor held by Class 1 Claimants.

**5.2.6. Corporate Governance:** Class 1 Claimants shall not have a seat on the New Board unless and until the Reorganized Debtor misses an interest payment after having had a cure period of not less than (30) days from the date on which the interest payment originally fell due. Class 1 Claimants shall be afforded full observer status at all board meetings until all CMI Secured Notes have been paid in full. In the event that the Reorganized Debtor misses an interest payment, after having had a cure period of not less than thirty (30) days from the date on which the interest payment originally fell due, William Harris Investors will be afforded a full voting seat on the New Board until the CMI Secured Notes have been paid in full. At William Harris Investors's discretion, once the Reorganized Debtor has paid all past due interest and has become current in its payments on the CMI Secured Notes, William Harris Investors may choose to return to full observer status with respect to the New Board.

**5.2.7. Releases: From and after the Effective Date, William Harris Investors and Steven Hirsh shall be released from all Liabilities (including, but not limited to, all Causes of Action, Assigned Causes of Action, Class Action Causes of Action, D&O Actions and Pre-Petition Causes of Action) - - whether arising before, on or after the Petition Date - - in any way relating to, but solely to the extent relating to, the Debtor, the Debtor in Possession, the Debtor's conduct of its business, the Chapter 11 Case, this Plan and the Disclosure Statement. Moreover, from and after the Effective Date, William Harris Investors and Steven Hirsh (in Hirsh's capacities as (i) an officer or director of the Debtor, (ii) an officer or director of HealthShield, and (iii) an agent of William Harris Investors) shall be released from all Liabilities in connection with the Secured Notes, including any claims for the return of funds which William Harris Investors received from the Debtor prior to the Petition Date. The foregoing releases shall extend to any and all Liabilities that could be asserted, solely on behalf of the Debtor or the Debtor's estate, by the Debtor, Debtor in Possession, any trustee or official or unofficial committee (including the Creditors' Committee), Creditor, shareholder (including holders of Old Common Stock) or other party in interest in the Chapter 11 Case.**

**5.2.8. Covenants:** The CMI Secured Notes shall have senior and senior subordinated covenants, respectively, and both affirmative and negative covenants, as set forth more fully in the CMI Secured Notes themselves, in substantially the form annexed hereto as Exhibit B.

5.3 <u>Treatment of Class 3</u>.

(a) <u>Subordination of Class 3 Claims.</u> The subordination provisions of section 510(b) of the Bankruptcy Code will be enforced. Each Allowed Claim in Class 3 shall be treated as not

subordinated, unless on or before the Effective Date, an objection is made to such claim on the ground that such claim is subordinated pursuant to section 510(b) of the Bankruptcy Code. An objection on such ground, that is pending as of the Effective Date, shall cause such Claim to be treated as a Disputed Claim for purposes of distribution. In the event the same holder holds both (i) either an Allowed August Debenture Claim or an Allowed December Debenture Claim and (ii) an Allowed Claim that is subordinated pursuant to section 510(b), for which the security of the Debtor upon which subordinated claim is based is either an Allowed August Debenture Claim or an Allowed December Debenture Claim, then such holder shall receive distribution solely under section 5.3 of the Plan, and not under section 5.4 thereto. If a holder has only an Allowed Claim that is subordinated pursuant to section 510(b) of the Bankruptcy Code, then that Allowed Claim shall receive the treatment set forth in section 5.4 of the Plan.

(b) <u>Distribution to Class 3 Claimants.</u> On the Effective Date, each holder of an Allowed Claim in Class 3 (i.e., unsecured, nonpriority Claims not subordinated pursuant to section 510(b) of the Bankruptcy Code) shall receive (i) a Pro Rata distribution of shares of New Common Stock, aggregating, in total for Class 3, all of the New Common Stock -- except for that New Common Stock either issued to Class 1 Claimants or held by Reorganized CMI pursuant to this Plan -- and shall also receive (ii) a Pro Rata distribution of certificates (the "Litigation Trust Certificates") representing an entitlement to a portion of the net proceeds of the Litigation Trust, subject to the payment to Class 1 Claimants of the Litigation Trust Notes.

Distributions to holders of Allowed Class 3 Claims shall not exceed the Class 3 Claim Amount. All aspects of the Litigation Trust, including, but not limited to, the issuance and distribution of the

Litigation Trust Certificates, are subject to the terms of the Litigation Trust Agreement. The Litigation Trustee is not obligated to issue any certificates to the Litigation Trust's beneficiaries, unless and until all Claims in Class 3 are either Allowed, Disallowed, or otherwise resolved by Final Order of the Bankruptcy Court. The Litigation Trustee's duties are subject to the terms and conditions of the Litigation Trust Agreement, the Plan and the Confirmation Order.

(c)     <u>Surplus Distribution to Reorganized CMI from Litigation Trust.</u>  In accordance with section 5.05 of the Litigation Trust Agreement, Reorganized CMI shall receive the Trust Assets (as defined in the Litigation Trust Agreement) once the Litigation Trust Expenses (defined in the Litigation Trust Agreement) and all obligations of the Litigation Trust to Professional Persons, HealthShield, Class 1 Claimants and Creditors are satisfied in full.

(d)     <u>Creation of Litigation Trust.</u>  On the Effective Date, all Assigned Causes of Action will be transferred to the Litigation Trust. Pursuant to the Litigation Trust Agreement, a copy of which is annexed to this Plan as Exhibit A, the Litigation Trustee will prosecute and administer all of the Assigned Causes of Action for the benefit of the Class 3 Claimants and others, as expressly set forth in the Litigation Trust Agreement.

5.4     <u>Treatment of Class 4.</u>  On the Effective Date, each holder of an Allowed Claim in Class 4, subordinated pursuant to section 510(b) of the Bankruptcy Code, shall receive a Pro Rata distribution of Litigation Trust Certificates representing an entitlement to the net proceeds of the Litigation Trust in excess of the Class 3 Claim Amount, up to the Class 4 Claim Amount. To the extent that Allowed Class 3 Claims are paid in full, any remaining net proceeds of the Litigation Trust shall be distributed to the holders of allowed Class 4 Claims.

5.5     Treatment of Class 5.  On the Effective Date, all Indemnification Claims shall be deemed irrevocably and unconditionally waived and discharged, except to the extent permissible without affecting the coverage of such Claims under the Debtor's insurance policies, which shall be kept in full force and effect.

5.6     Treatment of Class 6.  On the Effective Date, each holder of a Class 6 Allowed Claim shall receive the surrender of the collateral securing the holder's Allowed Claim.

5.7     Treatment of Class 7.  On the Effective Date, holders of Convenience Claims shall receive Cash equal to 50% of the Allowed amount of their respective Convenience Claims.

5.8     Treatment of Class 8.  On the Effective Date, each existing share of, and option and warrant for, Old Common Stock, will be cancelled.  The holders of Old Common Stock will receive no distribution whatsoever from the Debtor's estate on account of their shares of, or options and/or warrants for, Old Common Stock.

**ARTICLE 6**: **Means of Implementing the Plan**

6.1     Implementation of Treatment for Classes.  On the Effective Date, the Debtor, Reorganized Debtor and the Creditors' Committee (as appropriate) shall be deemed to have made all transfers of Property and Assigned Causes of Action to the Litigation Trust provided for in the Plan. All payments, except those provided for in the Professional Fee Agreements found in, and pursuant to, section 2.3 of the Plan, shall be made in Cash from accounts maintained by the Debtor, or the account maintained jointly by the Debtor and the Creditors' Committee.

6.2     Issuance of New Common Stock and Security Listing.   As of the Effective Date, the Old Common Stock shall be canceled without further act by any person whatsoever, and the Debtor

shall be authorized to issue one hundred million shares of New Common Stock. Subject to the full

discretion of the New Board, the Reorganized Debtor will use reasonable efforts to obtain and maintain

a listing on a nationally recognized securities market for the New Common Stock, including the OTC

Bulletin Board. The Reorganized Debtor shall not permit or otherwise authorize any trading in its New

Common Stock (or in any other securities it may issue, whether pursuant to this Plan or otherwise) until

the SEC Compliance Date. Any debt or equity security the Reorganized Debtor may issue prior to the

SEC Compliance Date (pursuant to this Plan or otherwise) shall bear a legend on the face of such

security, which legend shall provide that such security may not be traded -- whether publicly or

privately -- prior to the SEC Compliance Date.

      6.3    <u>Exemption from Certain Securities Laws</u>. Under section 1145(a) of the Bankruptcy

Code, the issuance of the New Common Stock to be distributed under this Plan and the subsequent

resale of such stock by entities that are not "underwriters" (as per section 1145(b) of the Bankruptcy

Code) are not subject to the registration requirements of section 5 of the Securities Act of 1933.

**Because of the complex, subjective nature of the question of whether a particular
holder may be an underwriter, the plan proponent makes no representation concerning the
ability of any person to sell or dispose of the New Common Stock.**

**The plan proponent recommends that recipients of New Common Stock under the plan
consult with legal counsel concerning the limitations, if any, on their ability to dispose of that
stock.**

      6.4    <u>Surrender of Debentures Canceled Under the Plan; Release of the August Indenture</u>

<u>Trustee and the December Indenture Trustee.</u> On the Effective Date, or on such other date thereafter

as is commercially reasonable and feasible, the Reorganized Debtor shall deliver shares of New

Common Stock in the amount of the August Allocation to the stock transfer agent to be hired by the

Reorganized Debtor's New Board, which stock transfer agent (the "Transfer Agent") shall issue such shares to the holders of the August Debentures. As a condition precedent to receiving such shares, holders of the August Debentures shall surrender such debentures to the Transfer Agent who shall, in turn, cancel and return the debentures to the Reorganized Debtor. On the Effective Date, or on such other date thereafter as is commercially reasonable and feasible, the Reorganized Debtor shall deliver shares of New Common Stock in the amount of the December Allocation to the Transfer Agent who shall issue such shares to the holders of the December Debentures. As a condition precedent to receiving such shares, the holders of the December Debentures shall surrender such debentures to the Transfer Agent who shall, in turn, cancel and return the debentures to the Reorganized Debtor. (Claims on account of Treasury August Debentures and Treasury December Debentures shall receive the treatment provided for in section 6.22 below.)

Pursuant to section 1143 of the Bankruptcy Code, holders of August Debentures and December Debentures that have not surrendered such debentures to the Transfer Agent within five years of the Confirmation Date may not participate in the August Allocation or December Allocation (as applicable) under the Plan. Except to the limited extent necessary to effectuate the terms of this Plan, the August Indenture and the December Indenture shall be retired as of the Effective Date. The Transfer Agent shall be reimbursed in full by the Reorganized Debtor for all its reasonable costs, fees and expenses (including, but not limited to, reasonable attorneys' fees, costs and expenses) incurred in connection with the surrender and cancellation of the August Debentures and the December Debentures (as the case may be) and the exercise of the duties set forth at this section 6.4 of the Plan.

In addition, the Reorganized Debtor shall fully indemnify the August Indenture Trustee and the December Indenture Trustee in connection with the exercise by the August Indenture Trustee and the December Indenture Trustee of the obligations set forth in sections 6.4, 6.5, 6.6 and 6.10 of the Plan (the "Indenture Trustee Indemnification Obligations").

**From and after the Effective Date, (i) the August Indenture Trustee shall be released from any and all Liabilities and Causes of Action in any way relating to the August Debentures, the August Indenture, the Chapter 11 Case and this Plan, and (ii) the December Indenture Trustee shall be released from any and all Liabilities and Causes of Action in any way relating to the December Debentures, the December Indenture, the Chapter 11 Case and this Plan.**

6.5     Closing of Books Related to Canceled Debentures.  On the Effective Date, each of the respective transfer books maintained for the canceled Debentures shall be closed.  Except for the right to receive the distributions, if any, to be made pursuant to the Plan, the holders of a canceled Debenture shall have no rights arising from or relating to such canceled Debentures after the Effective Date, including rights of subordination or subrogation that may be construed to be inherent in or ancillary or related to such canceled Debentures.

6.6     No Distribution of Fractional Shares.  No distribution of less than one share shall be made under this Plan.  Whenever any distribution of a fraction of a share would otherwise be called for, the actual distribution shall reflect a rounding of such fraction to the nearest whole share (up or down).

6.7     Employment of Professionals.  The Litigation Trustee, the Debtor, Reorganized CMI, the August Indenture Trustee and/or the December Indenture Trustee, and the Transfer Agent shall

have the right (without application to the Bankruptcy Court) to retain professionals to assist them in carrying out the duties and obligations imposed under the Plan. The Debtor, the Reorganized Debtor, the Litigation Trustee, the August Indenture Trustee, the December Indenture Trustee and the Transfer Agent may employ the professionals previously employed by the Debtor or by the Creditors' Committee. If retained by the Litigation Trustee, each such professional may be retained on a contingency fee basis on terms at the sole discretion of the Litigation Trustee.

6.8     Establishment of the Litigation Trust. On the Effective Date, there shall be established the Litigation Trust, and all Assigned Causes of Action shall be vested in the Litigation Trust, free and clear of Claims and interests of creditors and equity security holders, except to the extent provided for in the Plan.

6.9     Right to Investigate, Evaluate and Pursue Causes of Action; Statute of Limitations. On the Effective Date, the Litigation Trustee -- in place and in stead of the Debtor, the Creditors' Committee, or any special litigation counsel retained during the Chapter 11 Case -- shall be deemed appointed to investigate, evaluate and pursue all Causes of Action or Claims transferred, respectively, to the Litigation Trust. Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Litigation Trustee will have the exclusive right to enforce, prosecute, settle or withdraw against any Person any and all Assigned Causes of Action.

With respect to the Litigation Trust, the Litigation Trustee -- as the representative of the assignees of the rights of (i) the Debtor, (ii) the Debtor's estate, and (iii) the Creditors' Committee, under the Assigned Causes of Action -- shall be a "party in interest" pursuant to section 1109 of the Bankruptcy Code and, from the Effective Date, shall have all the rights and remedies provided under

60609                                    -30-

the Bankruptcy Code to parties in interest. The Litigation Trustee shall have the right to commence and conduct examinations of any party pursuant to Rule 2004 of the Bankruptcy Rules.

6.10    Execution of Documents to Effectuate Plan. The Debtor, the August Indenture Trustee, the December Indenture Trustee, the Creditors' Committee, the Litigation Trustee and the Transfer Agent shall have the power to execute any instrument or document to effectuate the provisions of the Plan, including without limitation the transfer of any Cash or property required by the Plan, the Litigation Trust Agreement and the Litigation Trust Notes. The Debtor may, subject to Bankruptcy Court approval, designate one or more agents to execute such instruments or documents. Secured Creditors and all other necessary parties shall execute or deliver, or join in the execution and delivery, of any instrument required to effect a transfer of property under the Plan, and shall perform any other act, including the satisfaction or assignment of any lien, that is necessary for the consummation of the Plan.

6.11    Allowance of Claims. Allowance of Claims shall be in all respects subject to the provisions of section 502(d) of the Bankruptcy Code. The Litigation Trustee shall have one hundred eighty (180) days from the Effective Date to file an objection to any Claim. The determination of which General Unsecured Claims are Disputed Claims shall not be made until the expiration of such 180-day period from the Effective Date.

6.12    Right of Setoff. Except for any Claim Allowed in an amount set forth in the Plan, the Litigation Trustee shall have the right to set off against any Claim (and the distributions to be made pursuant to the Plan in respect of such Claim) any and all debts, liabilities and Claims of every type and nature whatsoever which the Debtor's estate may have against the holder of such Claim, and neither any

prior failure to do so nor the allowance of such Claim, whether pursuant to the Plan or otherwise, shall constitute a waiver or release of any such right of setoff.

6.13    Authorization of Corporate Action.  Entry of the Confirmation Order shall authorize the Debtor and the Litigation Trustee to take, or cause to be taken, all corporate actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after, the Effective Date.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the Reorganized Debtor's stockholders or the New Board.

6.13.1 Authorization to Amend Contracts with HealthShield.  In addition to the general authority provided in section 6.13 hereof, the Reorganized Debtor is authorized to amend its pre-Petition Date contracts with HealthShield (the "HCC Contracts") and HealthShield's two senior corporate officers and managers, Dennis Shields and Harvey R. Hirschfeld, as provided for in the "Debtor's Contracts with HealthShield, and with Dennis Shields and Harvey Hirschfeld, as Amended by Negotiations with Creditors' Committee," annexed as Exhibit F to this Plan.

6.14    Termination of Retirement Plan.  Unless previously terminated by Final Order, on the Effective Date, the Retirement Plan shall be terminated, and the Debtor or the Reorganized Debtor shall be authorized to take all action necessary to terminate the Retirement Plan and distribute the assets of the Retirement Plan.

6.15    Reserves for Disputed Claims.  On the Effective Date, the Reorganized Debtor or the Litigation Trustee, as appropriate, shall reserve for the account of each holder of a Disputed Claim (i) the property which would otherwise be distributable to such holder on such date in accordance with the

Plan were such Disputed Claim an Allowed Claim on such date, in the face amount thereof, or such other amount as ordered by the Bankruptcy Court, or (ii) such other property upon which such holder, the Reorganized Debtor and the Litigation Trustee may agree.  Property reserved under this section shall be set aside and segregated by Class of Claims.  To the extent such Disputed Claim becomes an Allowed Claim, the property so reserved for the holder thereof shall be distributed to such holder pursuant to, and to the extent provided for in, the Plan.  Upon any Disputed Claim becoming a Disallowed Claim in whole or in part, the property reserved for the payment of the Disallowed portion of such Disputed Claim, including any interest or dividends attributable thereto, shall become available for distribution to Holders of Allowed Claims in accordance with the provisions of the Plan.

6.16    Reserve for Estimated Expenses.  Prior to the Effective Date, the Debtor, in consultation with the Creditors' Committee, shall fund an expense reserve (the "Administrative Expense Reserve") for payment of any Administrative Expense Claims (other than Professional Fees and Expenses) that are accrued and unpaid or are anticipated to be incurred by the Debtor.  The Administrative Expense Reserve shall be funded from all Cash in the estate.  Once all Administrative Expense Claims remaining unpaid have been paid in full and no other Administrative Expense Claims are anticipated to be incurred, any Cash remaining in the Administrative Expense Reserve shall become available to the Litigation Trust.

6.17    Payment or Distribution of Disputed Claim.  No payments or other distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim, or portion thereof, is Allowed by Final Order, or unless otherwise provided by order of  the Bankruptcy Court.

Holders of Disputed Claims whose Claims ultimately become Allowed Claims shall be bound, obligated and governed in all respects by this Plan's provisions.

6.18    Timing of Payment or Distribution When a Disputed Claim Becomes an Allowed Claim. Subject to the provisions of the Plan, payments and distributions with respect to each Disputed Claim that becomes an Allowed Claim shall be made on the next distribution date following the date on which the Claim becomes Allowed.

6.19    Disputed Distribution. If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any distribution, either the Reorganized Debtor or the Litigation Trustee, as appropriate, may, in lieu of making such distribution to such holder, make such distribution into an escrow account until the disposition shall be determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

6.20    Estimation. In order to effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Estate, the Debtor (prior to the Effective Date) and the Reorganized Debtor, and (after the Effective Date) the Litigation Trustee, shall have the right to seek an order of the Bankruptcy Court, after notice and a hearing (which notice may be limited to the Holder of such Disputed Claim and which hearing may be held on an expedited basis), estimating a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code.

6.21    No Release for Pre-Petition Causes of Action. This Plan shall not provide for any release of a Pre-Petition Cause of Action against the Debtor or any of its officers or directors, except as expressly set forth in the Plan. **The Class Action Causes of Action are not released under this Plan, or under any release granted pursuant to this Plan, except that such Class Action**

**Causes of Action are released solely against the following persons or entities: (i) the Debtor; (ii) William Harris Investors; and (iii) Steven Hirsh.**

      6.22    <u>Treatment of Treasury August Debentures and Treasury December Debentures.</u> Claims for Treasury August Debentures and Treasury December Debentures shall be deemed Allowed Claims for purposes of this Plan. The Reorganized Debtor shall be entitled to receive its Pro Rata share of New Common Stock, and of Litigation Trust Certificates, based on its Allowed Claims for Treasury August Debentures and Treasury December Debentures, to the same extent as any Creditor holding an Allowed Class 3 Claim.

<b><u>ARTICLE 7</u>: <u>Conditions Precedent to Confirmation</u></b>

      7.1    <u>Conditions</u>. The Plan shall not become effective, the Effective Date shall not occur, and no obligations and rights set forth in the Plan as of the Effective Date or thereafter shall come into existence, unless each of the following conditions is met or, alternatively, is waived, in accordance with section 7.3 hereof, by both the Debtor and the Creditors' Committee, on or before the Effective Date:

      (a)    An order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code, and approving the Disclosure Statement for distribution to creditors, shall have been entered, pursuant to Bankruptcy Rules 5003 and 9021, and shall not have been stayed, suspended, modified, vacated or reversed;

      (b)    The Confirmation Order shall be in form and substance reasonably acceptable to both the Debtor and the Creditors' Committee, and shall, <u>inter alia</u>,

      (i)    approve, authorize, and direct the creation of the Litigation Trust, approve the Litigation Trust Agreement, and the appointment of the Litigation Trustee;

(ii)    decree that the assets of the Debtor not transferred to the Litigation Trust shall be free and clear of all Claims, Liens and encumbrances, except as provided in this Plan;

(iii)   decree that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(iv)   decree that all transfers of the Debtor's assets to the Litigation Trust, and as otherwise contemplated under this Plan, shall be free and clear of all liens, Claims, and encumbrances against such assets;

(v)    authorize implementation of this Plan in accordance with its terms;

(vi)   provide that any transfers effected under this Plan shall be and are exempt from any state, city or other municipality transfer taxes, mortgage recording taxes and any other stamp or similar tax under section 1146(c) of the Bankruptcy Code;

(vii)  approve all of the settlements, transactions, notes, releases and agreements to be effectuated pursuant to this Plan in all respects;

(**viii**) **include an injunction to permanently enjoin and restrain all Entities (as defined in section 101 of the Bankruptcy Code) from asserting against the Debtor, the Debtor in Possession, the Creditors' Committee, the August Indenture Trustee, the December Indenture Trustee, William Harris Investors and Steven Hirsh (including their respective post-petition professionals with regard to post-petition services provided on their respective behalf; collectively, the "Releasees"), any Liabilities from which the Releasees are released pursuant to sections 6.4, 10.4.1, 10.4.2 and 5.2.7 hereof, or from taking any of the following actions against such Releasees in respect of any Claim respecting any Liability so released pursuant to sections 6.4, 10.4.1, 10.4.2 and 5.2.7: (i) the commencement or continuation of any action or proceeding; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (iii) the creation, perfection or enforcement of any encumbrance of any kind; and/or (iv) the assertion of any right of setoff, counterclaim, subrogation or recoupment of any kind against any obligation due from any such Entity;**

**(ix) either (A)** include an injunction to enjoin and restrain DVI Business Credit Corporation and any Replacement Lender (and their respective partners, agents, affiliates, and successors and assigns) from

> **(1) interfering with HealthShield's performance of any of the HealthShield Plan Obligations (or any assistance HealthShield provides to the Reorganized Debtor to enable the Reorganized Debtor to satisfy its obligations under the Plan), and from**

> **(2) taking any of the following actions against HealthShield: (a) asserting a "claim" against HealthShield (as defined in section 101 of the Bankruptcy Code); (b) seeking to create, perfect, or enforce any encumbrance of any kind, other than those encumbrances explicitly given to the holders of Allowed Class 1 Claims under the Plan; (c) the assertion of any right of setoff, counterclaim, subrogation or recoupment of any kind against HealthShield; or (d) declaring a default by HealthShield under the HealthShield Loan and Security Agreement, or any amendments, modifications or successor agreements thereto, <u>to the extent that such actions in (a), (b), (c) and/or (d) are taken solely on account of, or on the basis of, HealthShield's performance of any of the HealthShield Plan Obligations (or any assistance HealthShield provides to the Reorganized Debtor to enable the Reorganized Debtor to satisfy its obligations under the Plan)</u>**; or, alternatively,

(ix)(B) in place and in stead of an injunction as in (ix)(A) above, DVIBC and HealthShield shall have entered into an amendment and modification of the HealthShield Loan and Security Agreement, which amendment and modification shall:

> (1) cure any pre-existing default of HealthShield under the existing HealthShield Loan and Security Agreement, and restore HealthShield to full compliance with the HealthShield Loan and Security Agreement, as amended and modified; and

> (2) confirm that the HealthShield Plan Obligations under the Third Amended Plan (or any subsequent Plan, as amended), and all exhibits annexed thereto -- including, but not limited to, those Plan Obligations pursuant to the Professional Fee Agreement -- are not in conflict with, and do not create a default under, HealthShield's obligations incurred,

and covenants given, under the HealthShield Loan and Security Agreement, as amended and modified;

(x)  provide that all executory contracts or unexpired leases assumed by the Debtor during the Chapter 11 Case or under the Plan shall be assigned and transferred to, and remain in full force and effect for the benefit of, Reorganized CMI or third parties, as the case may be, notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(xi)   provide that the transfers of property by the Debtor to Reorganized CMI (A) are or shall be legal, valid, and effective transfers of property, (B) vest or shall vest Reorganized CMI with good title to such property free and clear of all Liens, Claims, encumbrances, and interests, except as expressly provided in the Plan or Confirmation Order, (C) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law, and (D) do not and shall not subject Reorganized CMI to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, any laws affecting successor or transferee liability;

(xii)   decree that the Bankruptcy Court shall retain jurisdiction to the extent provided under the Plan;

(xiii)   determine that any objection to the adequacy of the information contained in the Disclosure Statement, not previously withdrawn or settled, is overruled, and the information contained in the Disclosure Statement was adequate for the purpose of soliciting ballots for confirmation of the Plan;

(xiv)   find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(xv)  except as expressly provided in this Plan, provide that all equity interests in the Debtor shall be extinguished and canceled, effective upon the Effective Date;

(xvi)   determine that (a) the transfers of the Assigned Causes of Action to the Litigation Trust are approved, binding, valid and authorized, and such assignment of the Assigned Causes of Action, are in the best interests of the estate and of the creditors affected by such transfers and (b) the transfers of the

Assigned Causes of Action to the Litigation Trust (A) are or shall be legal, valid, and effective transfers of property, (B) vest or shall vest the Litigation Trust with good title to such property free and clear of all Liens, Claims, encumbrances, and interests, except as expressly provided in the Plan or Confirmation Order, (C) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law, and (D) do not and shall not subject the Litigation Trust to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, any laws affecting successor or transferee liability;

(xvii)   provide that the Litigation Trustee is a party in interest in the Bankruptcy Case, pursuant to section 1109 of the Bankruptcy Code, with respect to each Assigned Cause of Action; and

(xviii)  provide that the Litigation Trustee shall be authorized to conduct examination of any Person, pursuant to Bankruptcy Rule 2004;

(c)     The Confirmation Order shall have been entered, pursuant to Bankruptcy Rules 5003 and 9021, and shall not have been stayed, suspended, modified, vacated or reversed;

(d)     The Purported Class Action Claim shall be resolved in one of the following ways:

(i) The Purported Class Action Claim shall have been withdrawn or disallowed in its entirety by an order of the Bankruptcy Court that has been entered, pursuant to Bankruptcy Rules 5003 and 9021, and shall not have been stayed, suspended, modified, vacated or reversed;

(ii) or, alternatively, the Purported Class Action Claim shall have been estimated by the Bankruptcy Court -- pursuant to an order that has been entered, pursuant to Bankruptcy Rules 5003 and 9021, and shall not have been stayed, suspended, modified, vacated or reversed -- in an amount not to exceed one dollar ($1.00) for purposes of voting and distribution under the Plan;

(iii) or, alternatively, the Purported Class Action Claim shall have been amended by the holders of such claim to allocate the claim as among (a) present holders of either August Debentures or December Debentures, who shall receive the treatment under this Plan provided to the holders of Allowed

Class 3 Claims, (b) former holders of either August Debentures or December Debentures, who shall receive the treatment under this Plan provided to the holders of Allowed Class 4 Claims, and (c) present or former holders of the Debtor's Old Common Stock, who shall receive the treatment under this Plan provided to the holders of Class 8 interests.

(e)     All documents authorized by and to be delivered pursuant to the Plan shall have been approved by the Creditors' Committee, the Litigation Trustee and the Debtor (as the case may be), and have been executed by the parties thereto;

(f)     the Debtor shall have created the Administrative Expense Reserve in an amount that is satisfactory to the Creditors' Committee; and

(g)     each Professional Person retained by the Debtor or the Creditors' Committee has agreed to be bound by, and not opt out of, either (1) the Professional Fee Agreement, or (2) alternative arrangements such as the Reorganized Debtor and the affected Professional Person may make for the payment of the affected Professional Person's Allowed Claim for Professional Fees and Expenses, in such a manner as to satisfy section 1129(a)(9) of the Bankruptcy Code.

7.2.     <u>Waiver of Conditions Precedent</u>.  Each of the conditions precedent in section 7.1 hereof may be waived or modified, in whole or in part, by the Creditors' Committee.  Any such waiver or modification of a condition precedent in section 7.1 hereof may be effected at any time, without any other notice, without leave or order of the Bankruptcy Court and without any other formal action, except for section 7.1(b)(viii), which may not be waived or modified in any respect, in whole or in part, without the prior consent of William Harris Investors, which consent shall not be unreasonably withheld.

## ARTICLE 8: <u>Executory Contracts</u>

8.1     <u>Treatment of Executory Contracts</u>.  Except as otherwise provided in the Plan or pursuant to a Final Order of the Bankruptcy Court expressly approving the Debtor's assumption  of, or authorizing the Debtor to enter into, an executory contract or unexpired lease, all executory contracts or unexpired leases shall be deemed rejected, effective as of the Effective Date.

8.2 <u>Contracts to be Assumed as of Effective Date.</u> The Debtor will not be assuming any of its present executory contracts and unexpired leases as of the Effective Date of this Plan; rather, as of the Effective Date, the Debtor shall reject any currently unexpired leases or executory contracts not otherwise rejected during the Chapter 11 Case.

8.3 <u>Procedures for Resolving Rejection Damage Claims.</u> Any Claimant asserting a Claim against the Debtor based on the Debtor's rejection of the Claimant's executory contract or unexpired lease, pursuant to the Plan or otherwise, must file with the Bankruptcy Court and serve a motion (and schedule a hearing thereon) to allow such Claims no later than ten Business Days after the date fixed by the Bankruptcy Court for the Confirmation Hearing. Notice of the hearing upon such Claim, together with any supporting documentation, must be served upon the Debtor's counsel, counsel to the Creditors' Committee, the United States Trustee, and all parties having filed a notice of appearance in the Chapter 11 Case. The Confirmation Order will explicitly provide that any Claimant that fails to timely file and duly serve a motion and supporting papers for a hearing thereon shall have its Claim expunged on that basis, and that such Claimant shall thereafter be enjoined from pursuing such Claim. The Bankruptcy Court shall resolve all timely filed motions.

8.3.1. <u>Filing of Proofs of Claim Arising from Debtor's Rejection of Executory Contracts.</u> If the Debtor's rejection of an executory contract or unexpired lease, pursuant to the Plan, results in a Claim or Administrative Expense Claim, then such Claim or Administrative Expense Claim shall be released and barred forever and shall not be enforceable against the Debtor, the Creditors' Committee or the Litigation Trustee, or any of their property, unless a proof of claim or Administrative Expense Claim is filed with the Bankruptcy Court and served upon counsel to the Debtor, counsel to the

<span>-41-</span>

Creditors' Committee and the Litigation Trustee within thirty (30) days after the earlier to occur of (a) the Confirmation Date or (b) the entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or lease. To the extent that such Claim or Administrative Expense Claim is Allowed, it shall be paid consistent with the treatment of General Unsecured Claims or Administrative Expense Claims under the Plan.

### ARTICLE 9: Post-Confirmation Business

9.1    _Business of Reorganized Debtor_.  Except as to (i) the Assigned Causes of Action, and (ii) any accounts receivable which may be owing to the Debtor as of the Effective Date, to the extent that such accounts receivable are not Designated Receivables (all of which shall vest in the Litigation Trust, as of the Effective Date), all property of the estate (pursuant to section 541 of the Bankruptcy Code) will become property of the Reorganized Debtor.  As of the Effective Date, the Reorganized Debtor shall own at least eighty percent (80%) of HealthShield's stock.[1]

9.2    _Management and Board of Reorganized Debtor_.  Each of the remaining members of the current board of directors and each of the officers and employees of the Debtor shall be terminated automatically on the Effective Date.  The New Board shall consist of up to seven (7) members, four (4) of whom shall be appointed by the Creditors' Committee, two (2) of whom shall be shall be appointed by the management of HealthShield, and one of whom shall be an "at-large" member, appointed by the

---

[1]  Creditors are advised to consult the Disclosure Statement, and the exhibits annexed thereto (including HealthShield's most recent financial statements and balance sheets) for a detailed description of HealthShield's history, current business and future prospects.

Creditors' Committee, in consultation with HealthShield and William Harris Investors in advance of the Effective Date.[2]  Additionally, William Harris Investors shall have observer status on the New Board.

Members of the New Board will be compensated in stock or warrants of the Reorganized Debtor for serving as members, as the New Board may determine.  The New Board will select the Reorganized Debtor's management, which, at the New Board's discretion, may include former employees of the Debtor, or of HealthShield.   The New Board shall also implement section 6.13.1 of this Plan, concerning the Debtor's contracts, as amended, with HealthShield and with HealthShield's two senior managers and officers, Dennis Shields and Harvey R. Hirschfeld.  (The agreement among the Debtor, the Creditors' Committee, HealthShield, and Shields and Hirschfeld individually, is annexed to this Plan as Exhibit F.)

Except with regard to acts (or failures to act) of gross negligence, malfeasance, fraud or breach of fiduciary duty, the Reorganized Debtor will take all steps necessary to indemnify the members of the New Board, including, but not limited to, the provision for such indemnification in the Reorganized Debtor's by-laws and the purchase and maintenance of "directors and officers" liability insurance, to the extent economically available, with sufficient levels of coverage under the circumstances, and which insurance provides for payment of the legal fees, costs and expenses of the members of the New Board in the event that any Cause of Action is commenced against a member of the New Board in connection with, or relating to, his or her role as a member of the New Board.  Such directors and officers liability

---

[2]  In the event that, in advance of the Confirmation Hearing, any of the individuals that have been selected to serve on the New Board should decline to serve, or prove otherwise unable to serve, then the members of the Creditors' Committee, together with the senior management of HealthShield, shall choose alternates to serve as members of the New Board.

insurance, to the extent economically available, shall be in place, and be effective, as of the Effective Date.

9.3     Prohibition Against Issuance of Nonvoting Equity Securities.  The Debtor's by-laws shall be amended to include a provision prohibiting the issuance of nonvoting equity securities, and providing, in case there are several classes of securities possessing voting power, for an appropriate distribution of such power among the classes.

## **ARTICLE 10: Discharge; Injunction; Release; Exculpation**

10.1     Discharge From Debts Arising Prior to Confirmation.  Except as set forth in the Plan, on and from the Effective Date, the Debtor shall be discharged from any debt that arose prior to the Confirmation Date, and any debt of a kind specified in sections 502(g), (h), or (i) of the Bankruptcy Code, whether or not:

> (a)   proof of Claim based on such debt is filed or deemed filed under sections 501 or 1111(a) of the Bankruptcy Code;
>
> (b)   such Claim is allowed under section 502 of the Bankruptcy Code; or
>
> (c)   the holder of such Claim has accepted the Plan.

10.2     Injunctions.

10.2.1  Injunctions Against Interference with Consummation or Implementation of Plan.  The Confirmation Order shall contain an injunction against all entities who are bound by this Plan preventing the commencement or continuation of any judicial or administrative proceeding or the employment of any process to interfere with the consummation or implementation of this Plan or the payments to be made hereunder.

10.2.2. **Injunction Against Prosecution of Causes of Action, Assigned Causes of Action.** **Except as otherwise specifically provided for by this Plan, to the extent of any Assigned Causes of Action transferred and/or assigned to the Litigation Trust, as of the Effective Date all Persons (other than the Litigation Trustee) shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover any such Assigned Causes of Action, Claim or Cause of Action, satisfied, or released, or enjoined under this Plan or transferred to the Litigation Trust, to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by section 524 thereof.**

10.2.3. **General Injunction.** **Except as otherwise specifically provided for by this Plan, as and from the Effective Date, all persons and Entities shall be permanently enjoined and restrained from asserting against the Debtor, the Debtor in Possession, the Creditors' Committee, the August Indenture Trustee, the December Indenture Trustee, William Harris Investors and Steven Hirsh (and including each of their respective post-petition professionals with respect to post-petition services provided on their respective behalf; collectively, the "Releasees"), any Liabilities that the Releasees are released from pursuant to sections 6.4, 10.4.1, 10.4.2 and 5.2.7 hereof, or from taking any of the following actions against such Releasees in respect of any Claim respecting any Liability so released pursuant to sections 6.4, 10.4.1, 10.4.2 and 5.2.7: (i) the commencement or continuation of any action or proceeding; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (iii) the creation, perfection or enforcement of any**

**encumbrance of any kind; and/or (iv) the assertion of any right of setoff, counterclaim, subrogation or recoupment of any kind against any obligation due from any such Entity.**

      10.2.4   <u>Injunction Against Interference With HealthShield's Performance of Its Obligations Under Plan and Related Agreements.</u>  As and from the Effective Date, DVI Business Credit Corporation and any Replacement Lender (and their respective partners, agents, affiliates, and successors and assigns) shall be permanently restrained and enjoined from interfering with HealthShield's performance of any of the HealthShield Plan Obligations (or with any assistance HealthShield may provide to enable the Reorganized Debtor to satisfy its obligations under the Plan).  Moreover, as and from the Effective Date, DVI Business Credit Corporation and any Replacement Lender (and their respective partners, agents, affiliates, and successors and assigns) shall be permanently restrained and enjoined from taking any of the following actions against HealthShield:

           (i) asserting a "claim" against HealthShield (as defined in section 101 of the Bankruptcy Code);

           (ii) seeking to create, perfect, or enforce any encumbrance of any kind against HealthShield;

           (iii) asserting any right of setoff, counterclaim, subrogation or recoupment of any kind against HealthShield; or

           (iv) declaring a default by HealthShield under the HealthShield Loan and Security Agreement, or any amendments, modifications or successor agreements thereto,

**solely on account of, or on the basis of, HealthShield's performance of any of the HealthShield Plan Obligations (or any assistance HealthShield may provide to enable the Reorganized Debtor to satisfy its own obligations under the Plan).**

10.3　　<u>All Distributions in Full and Final Satisfaction</u>.  All payments and all distributions to be made hereunder (and pursuant to the Professional Fee Agreement) on account of Claims and Administrative Expense Claims shall be in full and final satisfaction, settlement, release and discharge of such Claims and Administrative Expense Claims, except as set forth in the Professional Fee Agreement.

10.4　　<u>Exculpation</u>

10.4.1　**<u>Exculpation for Debtor and Its Officers, Directors and Agents</u>.  The Debtor and its officers, directors, employees, attorneys, accountants, financial advisors, representatives and agents (including, but not limited to, the August Indenture Trustee and the December Indenture Trustee), will not have or incur any liability to the holder of any Claim or Old Common Stock, for any post-petition act or omission in connection with or arising out of the Plan or the property to be distributed under the Plan, and in connection with, arising out of or relating to the performance of the post-petition duties set forth in section 1107(a) of the Bankruptcy Code, and, in all respects, they will be entitled to rely upon the advice of counsel with respect to such matters and will be fully protected in acting or refraining from acting in accordance with such advice; provided, however, that the foregoing exculpation from liability will not apply to actions or omissions (a) in bad faith, or (b) as a result of recklessness, willful misconduct or gross negligence.**

**10.4.2 Exculpation for Creditors' Committee and its Professionals. Each member of the Creditors' Committee and his/her/its attorneys, accountants, financial advisors, representatives and agents, will not have or incur any liability to the holder of any Claim or Interest, for any act or omission in connection with or arising out of the Plan or the property to be distributed under the Plan, and in connection with, arising out of or relating to the performance of the duties set forth in section 1103 of the Bankruptcy Code, and, in all respects, they will be entitled to rely upon the advice of counsel with respect to such matters and will be fully protected in acting or refraining from acting in accordance with such advice; provided however, that the foregoing exculpation from liability will not apply to actions or omissions (a) in bad faith, or (b) as a result of recklessness, willful misconduct or gross negligence.**

## ARTICLE 11:  Provisions Governing Distributions

11.1     Payments in U.S. Dollars.  All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on a domestic bank selected by the Debtor, or by wire transfer from a domestic bank, at the option of the Debtor.

11.2     Distributions Only on Business Days.  Notwithstanding the foregoing provisions, if any distribution called for under this Plan is due on a day other than a Business Day, then such distribution shall instead be due on the next Business Day following such day.

11.3     Transmittal of Payments and Notices.  Except as the holder of a Claim may otherwise agree, any payment or notice to which such holder shall become entitled under the provisions of the Plan shall be delivered to such holder by regular first-class mail, postage prepaid, in an envelope addressed to

such holder as he or his authorized agent may direct in a request filed, on or before the Effective Date, with the Bankruptcy Court and, if such a request is not filed, to the address shown in the Schedules, or, if a different address is stated in a proof of Claim duly filed, to such address; provided that such holder may notify the Debtor of a change in address after the Effective Date. Where payment or delivery is made by mail, the date of payment or delivery shall be the date of mailing. Payments made in accordance with the aforementioned provisions of this subsection will be deemed made to the holder regardless of whether such holder actually receives the payment.

11.4     <u>Distributions Returned as Not Forwardable</u>.  Notwithstanding any of the foregoing, if a distribution made to the holder of any Allowed Claim is returned as not forwardable, and such holder fails to notify the Debtor of the proper address within 180 days after the Effective Date, then such holder shall have waived its rights to any distribution under this Plan.

**ARTICLE 12: Plan Interpretation, Confirmation and Voting**

12.1     <u>Procedures Regarding Challenges to Designation of Classes as Impaired or Unimpaired</u>.  In the event the designation of the treatment of a Class as impaired or unimpaired is challenged, the Bankruptcy Court shall determine the challenge, and voting shall be permitted or disregarded in accordance with the determination of the Bankruptcy Court.

12.2     <u>Withdrawal and Modification of Plan.</u>  This Plan may be withdrawn or modified by the Debtor at any time prior to the Confirmation Date.  At the request of either the Debtor or the Creditors' Committee, this Plan may be modified in any manner consistent with section 1127 of the Bankruptcy Code prior to substantial consummation thereof.  At the request of either the Debtor or the Creditors' Committee, this Plan may be modified after substantial consummation thereof with the

approval of the Bankruptcy Court, provided that such modification does not affect the essential economic treatment of any entity who does not consent in writing to such modification.

12.3     Cramdown of Plan.  If all applicable requirements for confirmation of this Plan are met, except for section 1129(a)(8) of the Bankruptcy Code, the Debtor intends to request that the Bankruptcy Court confirm this Plan pursuant to section 1129(b) of the Bankruptcy Code.

12.4     Governing Law.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or the law of the state of incorporation of the Debtor with respect to matters of corporate governance, the laws of the State of New York applicable to contracts executed in such State by residents thereof and to be performed entirely within such State will govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with this Plan.

12.5     Compliance With Tax Withholding and Reporting Requirements.  With respect to the Plan and all instruments issued and distributions made thereto, the Debtor will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

12.6     Effect of Unenforceable Plan Provisions.  If any provision of this Plan is determined to be unenforceable, the enforceability of other Plan provisions shall not be affected.

12.7     Dissolution of Creditors' Committee.  The Creditors' Committee will be deemed dissolved as of the Effective Date.


**ARTICLE 13: Retention of Jurisdiction**

13.1    From and after the Confirmation Date and until a final decree closing the Debtor's case

is entered (pursuant to Section 350 of the Bankruptcy Code and Rule 3022 of the Bankruptcy Rules),

the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Chapter 11 Case

for the following purposes:

(a)   to hear and determine any and all objections to the allowance of any Claim or Administrative Expense Claim or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtor to any creditors, holders of Claims, or parties in interest;

(b)   to hear and determine any and all applications for compensation and reimbursement of expenses by Professional Persons;

(c)   to hear and determine any and all pending applications for the rejection and disaffirmance of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

(d)   to hear and determine all adversary proceedings commenced on behalf of either the Debtor or the Creditors' Committee, pursuant to Federal Rule of Bankruptcy Procedure 7001 and, at the option of the Litigation Trustee, all Assigned Causes of Action commenced by the Litigation Trustee, whether or not pending as of the entry of the Confirmation Order;

(e)  to enforce the provisions of this Plan, including, but not limited to, those provisions concerning releases and injunctions;

(f)   to enjoin any Person from interfering with the implementation and consummation of the Plan or with the release and injunction provisions of the Plan;

(g)  to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of this Plan;

(h)  to interpret and determine such other matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code; and

(i)   to hear and determine any and all issues or controversies arising with regard to the Litigation Trust.

## ARTICLE 14: Miscellaneous Provisions

14.1    Headings.  Headings are utilized in this Plan for the convenience of reference only, and shall not constitute a part of this Plan for any other purpose.

14.2    Severability.  Should any provision in this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of this Plan.

14.3    Blank Ballots.  Any ballot which is executed by a holder of Old Common Stock, or by the holder of an August Debenture or December Debenture, but which indicates neither acceptance nor rejection of the Plan, shall be deemed an acceptance of the Plan.  Any ballot that does not comply with the filing instructions on the ballot for this Plan shall not be counted for voting purposes.

14.4    Payment of Statutory Fees.  All fees payable by the Debtor pursuant to 28 U.S.C. §1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid when due pursuant to the terms thereof; provided, however, that all such fees due for periods prior to the Effective Date shall be paid on or before the Effective Date.

14.5    No Interest.  Unless otherwise specifically provided for in the Plan or Confirmation Order, or as Allowed by a Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to such interest or any penalty or late charge accruing on or after the Petition Date on any such Claim.  Interest shall not accrue or be paid upon any Disputed Claim with respect to the period from the Petition Date to the date of distribution with respect to such Claim.

14.6    No Attorneys' Fees.  No attorneys' fees will be paid by the Debtor with respect to any

Claim or Interest (other than an Allowed Administrative Expense Claim for the payment of Professional

Fees and Expenses, as expressly provided for in and pursuant to section 2.3 of this Plan, and in the

Professional Fee Agreement, annexed as Exhibit D hereto), except as expressly specified herein or

Allowed by a Final Order of the Bankruptcy Court.

14.7    No Injunctive Relief.  No Claim or Interest shall, under any circumstances, be entitled

to specific performance or other injunctive, equitable or other prospective relief.

Dated:  New York, New York
        December 18, 2001


**COMPLETE MANAGEMENT, INC.**


By: _____/s/ Steven Rabinovici_____
        Name: Steven Rabinovici
        Title: Chief Executive Officer

**SALOMON GREEN & OSTROW, P.C.**
Attorneys for the Debtor and Debtor in Possession


By: ___/s/ Alec P. Ostrow_____
        Alec P. Ostrow (AO-3104)
        A Member of the Firm
        485 Madison Avenue
        New York, New York 10022
        (212) 319-8500